2, 1, 3, 3, 2, 6, Franklin v. Popovich It really doesn't matter. It's a big secret, but it doesn't. You can proceed when you're ready. Mr. Haynes, I see you saved six minutes for rebuttal. I did not. All right. Thank you. Ms. Franklin is actually here. Is it for her just to stay there or at the council table? Over there is fine. Thank you. All right. Thank you. Yes, I did reserve six minutes, Your Honor. All right. May it please this honorable court. Thank you. First, Your Honor, to the clerk, I apologize I was a little late today with the traffic. Now, to get to why we're here, Your Honor, if you all read, I know you read the order, and it perplexed me that we're really here on whether or not the law was clearly established as to whether or not the actions taken by Deputy Popovich were clearly established. But the order itself spends 80 percent saying that these facts that are argued by the plaintiff aren't really good facts, and they take the facts seemingly in the light most favorable to the defendant and not the plaintiff. And that is what led to what we believe the erroneous conclusion that the law is not clearly established, that his actions on that day were a violation of the Fourth Amendment. So at its bare bones, just right to the point, this court has been established since 1985 that when you shoot an unarmed suspect, you violate the Fourth Amendment. There's no question about that if you know or a reasonable officer would have known that he was unarmed. I mean, the question in this case is whether under these facts a reasonable officer would have known under the circumstances, as quickly as everything happened, as violent as one could infer, reasonably infer, he had been, an officer would have known he was unarmed. That's right, Your Honor. And before I give the court the history, because I'm sure the court knows it, we'll just take your 2020 opinion in Schuyler v. City of Homewood. The officers articulate a version of events that justify their use of force. Stryker tells a story that presents a clear constitutional violation. Resolving that dispute is for trial, not summary judgment. The district court thus erred in resolving disputes of fact against the plaintiff. That was a swearing match. We don't have a swearing match here. Well, in essence, Your Honor, we do have a swearing match, and I would like to just briefly point the swearing match out. The crux of their case is my client allegedly violently pulled his arm from underneath his left arm, not his dominant arm that they saw him shooting with, but his left arm from underneath one of the officers. Well, first I want to know how do you violently pull an arm? I mean, you can break the hands and do things like that, but there's no such thing as violently pulling your arm. I think the district court said convulsed. But the testimony was he violently pulled his arm from underneath. But we're looking at the district court order. That's what you've appealed. But the district court actually cites him pulling his arm, and they used the word violently. They may have also later said convulsed, but they used the word violently pulling your arm, which, again, is adding an adjective to something that is almost inanimate. Pulling your arm is not violent. I interpreted that as jerking his arm as opposed to trying to hit somebody with his arm. And that's how I interpret it. And in every case where a person jerks, we call that resisting without violence. And at no time are you allowed to use deadly force on a person that's in a prone position, okay? And, again, I'll give you—there's a history of cases— But isn't your case coming down to the fact, and the case law that you're citing, is whether or not the officer, Deputy Popovich, knew your client was unarmed when the fatal shot was fired? And you're fighting to have the introduction—that's what we're up on appeal— that the district court should have admitted some of the witnesses who would say, oh, we thought the gun was dropped. I mean, isn't that what it's coming down to, is if he's unarmed, the officer shouldn't have shot him? Yes, Your Honor, in his direct form. But the case law is whether or not the person posed immediate threat. But that's what I'm getting at. I mean, if you're—so Mr. Redding had engaged in a gunfight. So we have a situation—and let's just assume, as we must, in favor of your client, that Mr. Redding had dropped the gun, which makes him unarmed. And the two officers have not yet performed a search because Mr. Redding is bleeding, and they're waiting for protective equipment. So they're standing on his arms, and he jerks. And I think you acknowledged that there was a jerk of the arm. He says, I'm dying, and there's a jerk. In light of the gun battle, in light of the fact that they haven't done a search, in light of the fact that he jerked, even if they knew, and let's assume they knew he dropped the gun, why are we outside of the normal case law with a suspect who, though initially dangerous, has been disarmed? He could have had another weapon. He could have had a gun. He could have had another knife. And why aren't the officers at that time, in light of the whole situation, even knowing that he's discarded one gun, why can't the officer with that jerk assume that now this person is violent again? Well, because, one—and I was looking for the case. You have a recent decision dealing with a traffic stop, I think it was out of Miami-Dade, where the person actually had a gun. And the officer said, show me your hands. So he was showing the officer his hands with the gun, and the officer shot him. You all said we're going to send this down to the trial, in fact, to let a jury decide if that officer's assumption that that person was going to shoot him was reasonable. What case are you citing? It's one of the Miami-Dade cases. Is it a published opinion? I don't know. Again, I was trying to run out of time. But that matters. I'm not saying—even if it's unpublished, I'm asking for the court to adhere to what it has consistently held since 1985. This is what's unreasonable about allowing an officer to make that assumption. They're going to make it in every case. They're going to say, well, the person could have been armed. In fact, you have a published opinion where the person was armed with a knife at one time, and then the officer saw a bulge, saw him reaching for that bulge. The officer shot and killed. And this court, again, in a published opinion, said—I believe that might be the Leeds case—said, we're going to let a trier of fact decide that. In Leeds, we said the use of deadly force against a suspect who, though initially dangerous, has been disarmed or otherwise become non-dangerous. But in this case, what I just was reciting, the facts of your case, in light of the intense violence, in light of the fact they haven't searched him, even thinking that he has dropped one gun, why was it not reasonable for the officer, when the jerk movement occurred, to assume maybe there's another weapon? And if I may add to Judge Branch's question, there's evidence in this case that Deputy Popovich and Leone were told that he had more than one firearm. Now, setting aside whether or not that's true, they were told that. Actually, I think what they were told was that he said—that was in some report, a double hearsay, that a deputy told them, that an informant told them, that he wasn't going back to jail, that he was going to shoot it out or something like that. But there was never any information dispelled that he had multiple guns. But you want that report in and the double hearsay, so if you want some stuff coming in, aren't you going to have all of that stuff coming in? The things that I wanted to come in were based upon sworn audio recorded statements and sworn written statements that were part of the FDLE investigation. The deputy was unknown. Nobody could ever tell us who the deputy was that gave that unit the information. That doesn't matter. What matters is whether the officers heard that a deputy had said that. Well, let's see if we're now looking subjectively. This court has routinely said it's the objective, not subjectivity. Yeah, but the objective doesn't overlay the hearsay rule. They're two separate inquiries. What the objective does is say a reasonable officer in that position, if he had heard, gotten information that a deputy said that, would that have been, would the other facts, reasonable? I only have five seconds. Can I respond to that? You can respond, yes. If the standard is the objective officer, then what they subjectively believed does not matter. But what an objective officer could reasonably have believed does matter. You can't divorce reasonable belief from the inquiry just because it's objective. That's what reasonable means. That is always judged by, take our standard ground in Florida. It's always judged by a jury, and in this case it was taken out of them. No, no, no, no it isn't. I'm very familiar with that. I spent some good days and weeks of my life on an opinion in that, and it's not always judged by a jury. Even if it were, this isn't a standard ground case. That's correct, Your Honor, but the actual facts that were relied upon are disputed as to whether or not he, the reason this is always judged by a jury, but what we asked in our response brief is this. We cited you to what was reasonable about standing on a person who you believe may have another gun and not searching him. His response was, I didn't, he was bleeding, and we understood that. But then we asked, could you not have taken your foot and rolled him over to determine if he still had a firearm? He said, sure, I could, but I did not want blood on my shoe. At no point has any court ever said a person's shoes should take precedent over someone's life. We don't make those mistakes simply because we want, we don't want blood on our shoes. That's not reasonable, and a jury is, I'm not saying a jury would have said it was or wasn't reasonable. We're saying the jury should decide that. You don't get it just assuming another person had it, and they shoot out before and haven't shot since. All six cases were at the car. This man ran over 200 yards into the officers, 10 yard shots, so when he would keep shooting at the kids that was in the car. Mr. Haynes, I'm going to give you your full minutes, full six minutes back for rebuttal. You conclude now, thank you. May it please the court. Brian Mose on behalf of Appelli, Jason Popovich. I think it is appropriate to recognize the tragedy in this case. Not only to Sharika Franklin as the mother and representative and sole survivor for Christopher Redding, but also for Deputy Stalter who is still living with injuries from the gunshot wound to his hand, as well as Deputy Jason Popovich who is going to live the remainder of his life knowing that he was in the situation where he had to fire the final shots. In the order of appeal, the district court properly considered admissible evidence and applied the correct summary judgment standard by viewing the evidence and all factual inferences in the light most favorable to the appellant. District court had available a complete summary judgment record to include the sworn testimony of every law enforcement officer on scene. There's 18 months for appellate counsel to continue with his discovery and learn of any facts that would raise any inconsistency among the deputy's testimony. The court in this case specially noted in the order that it was not simply crediting the deputy's account of the incident in question because Mr. Redding was no longer present to rebut it. As to the issue on appeal, the district court found no genuine dispute of material fact as to the following. Mr. Redding had committed an extremely violent crime leading up to the shooting. Mr. Redding posed a serious threat of physical harm at the scene. Mr. Redding was actively resisting Deputy Popovich and Deputy Leone by moving his arms inward towards his torso after he'd been explicitly warned to keep his arms out and not move. Deputy Popovich, as is clear in the record before the court, had no reasonable basis to suspect that Mr. Redding was no longer armed with a weapon. Every reasonable officer in Deputy Popovich's shoes would not assume a violent criminal offender would only have a single weapon on his person or in his possession. A cautious officer would naturally assume that either he has more than one weapon or, as Deputy Popovich testified in this case, would logically deduce that in the heat or in the fog of a gunfight, that if the gun was not on the ground near Mr. Redding, that it very likely could be concealed within his waist or beneath him. That is the reason Deputy Popovich did not turn Mr. Redding and commence a search for a weapon because if he did so, he would be fully exposed to the threat that Mr. Redding could use the weapon against him. Counsel, let me ask you this. According to my notes, Nicole Moore stated that she noticed the police were shooting at Redding, but she did not see Redding shooting back at the police. Does that not put in issue the officer's account that he was shooting back at them? I don't believe it does, Your Honor. We have to recognize that Deputy Jason Popovich is in a foot pursuit with an individual who is engaged in a gunfight. He is taking cover behind cars. He is moving around cars. His observations of Mr. Redding are intermittent, as are the fellow deputies, and whatever observations this person may have had would not necessarily should not necessarily be imputed to the knowledge that Deputy Popovich had. I do not believe, Your Honor. It doesn't impute to their knowledge unless it provides a basis for a jury to find that they couldn't have had the knowledge because it didn't happen. Well, the district court did find triable issues, Your Honor, with respect to the reasonableness of Deputy Popovich's force. So now you're arguing that it wasn't clearly established that what the officers did in this case was wrong even if the deceased had not fired at them? Could you repeat the question, Your Honor? Yes. Are you saying that even if he hadn't fired at them, what the officers did in this case was reasonable? It has to be your argument. I mean, if Ms. Moore puts into dispute as a triable issue whether he fired at them or not, you've got to say even if he didn't fire at them, it wasn't clearly established that it was wrong for them to shoot him. Our position is this. We are here on a qualified immunity defense. I know that. Objectively reasonable, Officer and Deputy Popovich. I know that. And what your position has to be is it was objectively reasonable. Everything the officers did was objectively reasonable regardless of whether he had just engaged in a gunfight with them. As long as it was objectively reasonable for the deputies to perceive that he was still dangerous and still a threat to them and to fellow deputies. I gather the bullet that wounded the deputy wasn't recovered. I'm sorry, which? The officer who got wounded, shot and wounded. Yes. Friendly fire versus hostile fire. I gather the bullet wasn't recovered and matched to a gun. That is correct, Your Honor. It was a through and through wound through the hand and out of the shoulder. Was there any evidence to corroborate the officer's testimony that Mr. Redding was shooting at them as he ran away? There is forensic evidence in the location of the shell casings that were located at the scene. There were three shell casings that were recovered from within and around the vehicle from which the shots were fired. We have testimony from the deputies that there was a burst in the glass from the vehicle in which Mr. Redding was in before the deputies initiated their fire, which would raise a very strong inference that Mr. Redding initiated the shooting. Right, but my question was directed to the period when he was running from the officers. There is forensic evidence that there are shell casings that were left behind in an easterly direction from the vehicle from which Mr. Redding fled as the deputies were engaging. What's in the easterly direction? The line of ejected cartridges or shell casings or the direction in which they were pointing? Well, the shell casings follow the reported path that Mr. Redding... They laid out a path, so to speak. It wasn't that they were all pointing in one direction. No, I misspoke. You are correct. It was they follow the path in which Mr. Redding took flight. To remove the shield of qualified immunity, appellant does not have to come forward with clearly established case law directly on point. But for the right to be clearly established, it is impressive unless it places the constitutional question beyond debate. In the case of White v. Pauley decided by the Supreme Court in the same year of the shooting, the court reiterated that qualified immunity is important to a society as a whole because immunity from suit is effectively lost if a case is erroneously permitted to go to trial. The court warned that clearly established law should not be defined at a high level of generality. The court explained that its holdings in Graham and Gardner do not by themselves clearly establish law outside of the obvious case. The court also reiterated that public officials like Deputy Popovich must be given fair notice of their personal liability through pre-existing case law that makes their unlawfulness apparent to them. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified immunity simply by alleging a violation of an abstract right. The nexus between the particularized case law and a public official's conduct is crucial to the qualified immunity analysis in this case. Specifically, in the context of Fourth Amendment protections concerning law enforcement, this nexus must be substantially clear so that when the officer is required to make a split-second judgment as to the proper use of force, the officer need not hesitate in fear that they may be held personally liable. The correctness . . . Would you agree that if the officer knew that Mr. Redding was unarmed and he's fleeing, that there would be clearly established law saying that their actions were unconstitutional? It would depend, Your Honor, as to when the deputies knew he was unarmed because we have case law where it is established that the deputy knew that the suspect was unarmed, but they still presented a threat and they fired the fatal shot. And that case is exactly Harris v. Billups, which was decided by this court in 2023. And interestingly, the Billups case involved the shooting that occurred in August of 2017, just six months after the incident shooting here. Well, here, though, the officers aren't claiming that he was a threat other than from a potential weapon, right? No, Your Honor. The officers are condemning that he remained . . . I mean, at the point where he shot. Where they had him at gunpoint in the instant prior to his movement. They had him at gunpoint and they felt that the threat was then contained by their physical restraints in the manner which is in the record and their being at ready with guns present. Right, but my hypothetical assumes they know he's unarmed. Assuming that they had searched and assuming that they were aware . . . Get the search. They just knew he was unarmed. He was in a Speedo. No gun possible to be concealed on. That would raise a question as to the viability of a qualified immunity defense because it would necessarily raise a question as to the objective reasonableness of the deputy in that circumstance. Yeah. Do you shoot an unarmed man you know is unarmed and he's lying on the ground because he makes a sudden jerk with his arm? I recognize the precedent of this court in Hunter v. Leeds and I acknowledge that if the individual is no longer presenting a danger or a threat to personal harm, it would be a violation of the Constitution. Unless he's a fleeing felon that meets the prerequisite or requirements of Garner . . . Correct. . . . as modified in subsequent decisions, watered down. But that's a different issue. The correctness of the district court ruling as to clearly establish law is made evident by the decision in Harris-Phillips v. Anderson deciding in 2023. This court found that Officer Anderson did not violate the Constitution when she kept her gun drawn on Harris as he lay on the ground wounded after a gunfight and fired the fatal shot when Harris made a lurch. This court found that at the time of the shot was fired, Officer Anderson knew no guns were within Harris' immediate reach, although two guns were on the ground nearby. The court found that a reasonable officer standing in Anderson's shoes could believe that Harris was still armed. Like Mr. Redding, Mr. Harris demonstrated a willingness to shoot officers. Like Mr. Redding, Harris had been seriously wounded by gunshots. Like Mr. Redding, Harris was being held at gunpoint while Harris remained still on the ground. Officer Anderson reacted in an instant with lethal force when Harris made a sudden lurch. This court found that an objectively reasonable officer in Officer Anderson's shoes could believe that Harris was continuing the fight. Even though in granting qualified immunity in the Anderson case, the court explained that Officer Anderson could not have known whether Harris was writhing in pain or working up the momentum to reach for another gun or reach for a potential third gun in his waist. The court reiterated the longstanding principle that an officer, the Fourth Amendment does not require that an officer wait until a gun is drawn on them before using force. Even though the Harris-Phillips decision was decided in 2000, or published in 2023, it is relevant to establish law in 2017. Deputy Popovich asked that this court to compare these actions during his encounter with the actions of Officer Anderson during hers and affirm the district court grant of summary judgment. Thank you. Ms. Raines. Your Honor, about 30 days after the district court opinion, this court issued Robertson v. Sauls. The reason why I put it in my brief is twofold. First, the district court in Robertson v. Sauls and this court looked to the GBI report that contained statements from witnesses, summaries, things like that, where shell casings were found. The appellate is a little misplaced, or I'll just put it this way. All of the shell casings were near the car. Where Mr. Redding fell was over 200 yards away. No shots were fired by him. So the reason is to believe he's still armed. He could have had anything. He could have had a bazooka. He could have had anything could have happened. That's why the reasonableness of that must be determined by a jury because every officer is going to say in any sort of physical altercation, well, the person could have been armed. And you have addressed that in some unpublished opinions, but you addressed it in Robertson v. Sauls. This was a real shootout. A bunch of people got shot. It went into the house and continued to shoot. But what the law recognizes is if a person gives up, he surrenders, the officers don't get to continue to retaliate based upon what happened previously. Well, but in Robinson v. Sauls, Mr. Robinson was down, not moving, appeared to be unresponsive. So that's different from what we have here. Based upon the, I guess, the belief that he didn't move on a flashbang, but he had just previously moved. I was going to use my two minutes to just stay silent so that this court can understand the depth of standing on someone's arms for two minutes. What the record shows is that he complied with rolling over. He complied with spreading his arms out. Both officers said he was compliant. Then all of a sudden, those same arms which you see on the autopsy report, post-mortem, had bruises on them. That shows you how hard they were standing on his arms. Two sets of deputies came by to say, do you need help? Now you've got four people to now do a reasonable search to see if he's still armed. They sent them away. Our theory has always been, you shot one of our officers, you're not leaving here. They shot the man twice, but three shots were actually fired to the back of his head when he had been compliant for, let's say, a minute and 50 seconds of the two minutes that he was stretched out. He ran over 200 yards. Now, again, he's not a full-time sprinter because he has bullets in him. He has not fired. How reasonable is that to say, well, maybe he still has a gun? Wouldn't he have whipped that gun out and started shooting? At some point in time, when he collapsed, they said, we have control. We have it. And if he had not shot and he was just a person that was wiggling, didn't want to get in handcuffs, would this court say it's okay to use deadly force? Because that's who he is. What the case law has said is we separate what happened before to what happened now at the time of the use of force. And so we put that in a microcosm. From the time he stopped shooting, he ran from them. That means he's not a threat. He collapsed. That means he's not a threat. He's wounded and bleeding. That means he's not a threat. You two officers standing on two separate arms, that means he's not a threat. And you tell people, oh, we got this under control. Go back to that scene. That means he's not a threat. Everything that they did prior to the shooting means that he's not a threat. And you know he was with Popovich. His testimony in his deposition and what he gave to the FDLE was that, I saw him drop a gun. That's why on the video he's telling people, go look behind that tire rail. He knew where the gun was. So now the question is, for insurance to decide, did he convey that to Popovich and Popovich did as well since they were there together? If you allow officers to just say they could still have a weapon on them, that gives them a freedom to fire at any time. The first thing that's said, because we can't do anything about the fact they didn't have their body cameras on. They come on after he's been executed. And the first thing you hear is, excuse my language, God damn it, you got brain matter on my shirt. We have a dead individual. And they say that, oh, well, he was wanted for a serious crime. He had already been taken in on that crime. The record shows he gave them no problem. So how do we use it for you to believe that now he's such a threat when you executed the warrant about two weeks prior and he gave you no problem? Oh, because now somebody told you that somebody else said it. And how do we disprove that? I deal with that on the criminal side all the time. That would never have come into evidence on behalf of my criminal defendant that somebody told him that somebody said it. But that's what they want to use to say that we reasonably believe. If a jury tells Ms. Redding that that's reasonable, then that's reasonable. But to give an officer a shield under this premise, where he could have simply just, and he says, well, to roll him over would have exposed him. Guns don't shoot themselves. If he had a gun on him, rolling him over would have just allowed him to pull the gun out of him. They kicked it out, pulled it out, or whatever. You have two officers there, trained officers, there with him. That's all it takes, a little roll. Personally, you could have just washed your hands on the blood. But if you don't want to do that with the blood on your hands, that's fine. But to say you didn't want blood on your shoes, so you guessed that this man was armed and you took his life is not reasonable. We're asking this court, because I believe that some of the facts in the Robinson case would transcend to this, that if it had come out before that opinion, the district court judge may not have ruled the way he did. Because he did decide some of the facts in our favor. And with those facts in our favor, it is in dispute as to whether or not it was reasonable or time to believe that he was armed still. Thank you. Thank you. I understand your arguments, counsel. Court is adjourned until 9 a.m. tomorrow morning. All rise.